# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

Henry Craig,

    Plaintiff,

v.

                      CIVIL ACTION FILE
                      NO. 4:08-CV-0100-HLM

Georgia Correctional Health,
LLC, and
John Does,

    Defendants.

## ORDER

This case is before the Court on the Motion for Summary Judgment filed by Defendant Georgia Correctional Health, LLC ("Defendant") [54].[1]

---

[1]Plaintiff named John Does, who are several unidentified individuals, as defendants in this action. Because Plaintiff failed to identify or serve any of the John Does he sued in his Complaint prior to the close of discovery, the Court considers this action as proceeding only against Defendant Georgia Correctional Health, LLC ("Defendant") at this point.

AO 72A

(Rev.8/82)

# I.   Background

Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts.  See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc., 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, court must review all facts and inferences in light most favorable to non-moving party).   This statement does not represent actual findings of fact.  In re Celotex Corp., 487 F.3d 1320, 1328 (11th Cir. 2007).   Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

2

## A.   Factual Background

### 1.   The Parties

Plaintiff resides in Ringgold, Georgia.  (Dep. of Pl. at 12, 156.)  Defendant is a registered limited liability company that does business within Floyd County, Georgia.  (Compl. ¶ 11.)  Defendant contracts with Floyd County, Georgia, to provide prison health care.  (Id. ¶ 19.)

### 2.   The Events Giving Rise to this Lawsuit

On July 4, 2006, Plaintiff was arrested by the Floyd County, Georgia, Police Department.  (Def.'s Statement Material Facts ("DSMF") ¶ 1; Pl.'s Resp. DSMF ("PRDSMF") ¶ 1.)  As a police officer approached Plaintiff, Plaintiff began to walk away, stating, "go ahead and shoot me then, MF."  (Pl. Dep. at 62-63, 66, 71-72, 75, 77, 80, 84-85, 172, 174-75, 177.)   Plaintiff consumed

methamphetamine on the day before his arrest.  (Id. at 56-57, 59, 203.)

Back-up police officers arrived on the scene, and commanded Plaintiff to stop.  (Pl. Dep. at 76, 81, 83-85.) According to Plaintiff, he turned around to face the police officers, who then shot him with a Taser.  (Id. at 72-73, 76-77, 82-83, 173, 176-77.)

Plaintiff contends that a videotape of the incident shows the officers kicking and beating him.  (Pl. Dep. at 94-95.) Plaintiff further contends that a photograph depicted his head next to a puddle of blood.  (Id. at 178-79.)

An ambulance transported Plaintiff from the arrest scene to Floyd Medical Center.  (DSMF ¶ 5; PRDSMF ¶ 5.) Floyd Medical Center is either a level 1 or level 2 trauma center.  (Dep. of Susan Hatfield at 28-29 (describing Floyd

4

Medical Center as Level 2 trauma center); Dep. of Dr. Jimmy Graham at 10 (describing Floyd Medical Center as Level 1 trauma center).)

Floyd Medical Center's emergency room physicians issued a medical clearance, stating that Plaintiff was medically cleared to go to jail.  (Dep. of Jason Watts Ex. 5; Aff. of Susan Hatfield Attach. 1 at 1.)

At approximately 4:52 a.m., Jason Watts, an intake agent and paramedic, booked Plaintiff into the Floyd County Jail (the "Jail").  (Watts Dep. at 6-8, 17-19, 24; Hatfield Aff. Attach. 1 at 2-8.)   Mr. Watts did not recall any officer informing him about a specific medical concern regarding Plaintiff's health.  (DSMF ¶ 8; PRDSMF ¶ 8.)

As part of the Jail's intake screening process, Mr. Watts noted that the Floyd County Police Department brought

5

Plaintiff to the Jail after Plaintiff had received medical clearance from Floyd Medical Center. (DSMF ¶ 9; PRDSMF ¶ 9.) The arresting officer informed Mr. Watts that Plaintiff stated multiple times that he wished to die. (DSMF ¶ 10; PRDSMF ¶ 10.) The arresting officer also informed Mr. Watts that Plaintiff had been shot with a Taser. (Watts Dep. at 19-20 & Ex. 1; Hatfield Aff. Attach. 1 at 6.)

Mr. Watts recommended that the Jail staff place Plaintiff in a padded cell for observation, and the Jail staff did so. (Watts Dep. at 16; Dep. of David Goudreau at 15-16; Hatfield Aff. Attach. 1 at 6.) By virtue of being placed in the padded cell, Plaintiff automatically was placed on the list of inmates who needed to see the mental health medical provider. (DSMF ¶ 12; PRDSMF ¶ 12.)

AO 72A

(Rev.8/82)

At 7:30 a.m. on July 5, 2006, Susan Hatfield, a family nurse practitioner employed by Defendant, examined Plaintiff.  (DSMF ¶ 13; PRDSMF ¶ 13.)  Plaintiff was very uncooperative with Nurse Practitioner Hatfield.  (DSMF ¶ 14; PRDSMF ¶ 14.)   According to Nurse Practitioner Hatfield, Plaintiff was belligerent, appeared intoxicated, and did not want to discuss his medical condition with her. (DSMF ¶ 15; PRDSMF ¶ 15.)  Nurse Practitioner Hatfield assessed Plaintiff as being alert and oriented to person and place.  (DSMF ¶ 16; PRDSMF ¶ 16.)  Nurse Practitioner Hatfield noted dried blood on the exterior of Plaintiff's right ear, as well as blood behind the ear drum, which is indicative of a ruptured ear drum.  (DSMF ¶ 16; PRDSMF ¶ 16.)   Nurse Practitioner Hatfield noted in Plaintiff's progress notes that Plaintiff had received an evaluation and

7

medical clearance for the Jail from Floyd Medical Center. (Hatfield Dep. at 19-21 & Ex. 6; Hatfield Aff. ¶ 7 & Attach. 1 at 8.)  Nurse Practitioner Hatfield testified that, based on the information she received indicating that Floyd Medical Center had cleared Plaintiff for the Jail, she concluded that the medical staff simply should monitor Plaintiff while he remained on suicide watch, because Plaintiff had no new medical complaints following his arrival at the Jail.  (Hatfield Dep. at 22-23, 29; Hatfield Aff. ¶ 8.)

At noon on July 6, 2006, Dr. Ginn, a mental health provider and psychologist, examined Plaintiff in the suicide watch cell.  (DSMF ¶ 19; PRDSMF ¶ 19.)  Following his examination of Plaintiff, Dr. Ginn discharged Plaintiff from suicide watch.  (DSMF ¶ 20; PRDSMF ¶ 20.)

At 9:00 p.m. on that same day, Coretta Stevenson, a nurse, examined Plaintiff.  (DSMF ¶ 21; PRDSMF ¶ 21.) During Nurse Stevenson's examination, Plaintiff voiced no complaints and had normal vital signs.   (DSMF ¶ 22; PRDSMF ¶ 22.)  Nurse Stevenson observed that Plaintiff had an ataxic gait, and noted that Plaintiff needed continued monitoring.  (DSMF ¶ 23; PRDSMF ¶ 23.)

At 2:00 a.m. on July 7, 2006, Nurse Latimer assessed Plaintiff and found him to be sleeping, with even and unlabored respiration. (DSMF ¶ 24; PRDSMF ¶ 24.) Nurse Latimer noted no signs of acute distress.  (DSMF ¶ 24; PRDSMF ¶ 24.)

At 11:30 a.m. on that same day, Nurse Practitioner Hatfield examined Plaintiff.  (DSMF ¶ 25; PRDSMF ¶ 25.) During that examination, Plaintiff complained of a headache

9

for the first time since entering the Jail three days earlier. (Hatfield Dep. at 43; Hatfield Aff. ¶ 16 & Attach. 1 at 10.) Plaintiff contends that he was non-responsive for his first three days at the Jail.  (Pl. Dep. at 83, 93, 98, 203.) Further, David Goudreau, a former employee of the Floyd County Sheriff's Office, testified that he informed the medical department that Plaintiff might need to be re-evaluated, because Plaintiff was lying on the floor and appeared stiff.  (Goudreau Dep. at 21-22, 27-28, 31.)

Nurse Practitioner Hatfield testified that she knew that Plaintiff had a history of migraine headaches from her treatment of Plaintiff during his previous incarcerations at the Jail.  (Hatfield Dep. at 17, 14, 44, 51, 75; Hatfield Aff. ¶ 17.)  Nurse Practitioner Hatfield further testified that she was aware that Plaintiff had suffered an injury in an

10

automobile accident several years earlier, and that Plaintiff also previously suffered from neck and knee pain. (Hatfield Dep. at 44, 62.)

Nurse Practitioner Hatfield conducted a neurological examination, and found Plaintiff's pupils to be normal and reactive, and his gait within normal limits. (DSMF ¶ 30; PRDSMF ¶ 30.) Nurse Practitioner Hatfield also found that Plaintiff's heart and lungs were clear, and that his vital signs were within normal limits. (DSMF ¶ 30; PRDSMF ¶ 30.) Nurse Practitioner Hatfield testified that, based on her examination and what she knew of Plaintiff's history, she believed that Plaintiff's symptoms were consistent with his history of headaches. (Hatfield Dep. at 44; Hatfield Aff. ¶ 19.) Nurse Practitioner Hatfield gave Plaintiff Tylenol to

11

AO 72A
(Rev.8/82)

reduce the pain of his headache.   (Hatfield Dep. at 44;
Hatfield Aff. ¶ 19 & Attach. 1 at 10.)

Jail staff moved Plaintiff from suicide watch to general
population.  (DSMF ¶ 32; PRDSMF ¶ 32.)  Plaintiff contends
that, during his time in general population, he was lying on
the floor and could not get up to get his food.  (Pl. Dep. at
140-43, 214-15.)   Plaintiff also testified that, although his
cellmate brought his tray to him on one occasion, he could
only eat two bites because he could not hold up his head.
(Id. at 101-02, 210.)

At 8:30 a.m. on July 9, 2006, Jail personnel contacted
the   medical   department,   stating   that   Plaintiff   had
complained that he had not eaten in five days, that he had
only urinated once, that he could not get up, and that he
had a headache.  (Hatfield Aff. Attach. 1 at 12.)   Nurse

12

Dana Dodd examined Plaintiff and decided to move Plaintiff to the medical department for further observation and treatment.  (Hatfield Dep. at 45-47; Hatfield Aff. Attach. 1 at 12.)  The progress notes indicate that the Jail staff used a sheet as a gait belt to assist Plaintiff in walking to the medical department.  (Hatfield Aff. Attach. 1 at 12.)

Nurse Dodd's notes indicate that Plaintiff's gait was slow but steady, that his vital signs were within normal limits, that his pupils were equal and reactive, that the range of motion in his neck was within normal limits, and that he was alert and oriented as to person, place, and location. (Hatfield Dep. at 45-47; Hatfield Aff. Attach. 1 at 12.)  After moving Plaintiff to the medical department, Nurse Dodd gave Plaintiff two Percogesics for his complaint of headaches, provided Plaintiff with a cup to obtain a urine

13

sample for analysis, and asked Plaintiff to take in as much fluid as possible.  (DSMF ¶ 37; PRDSMF ¶ 37.)

At 11:05 a.m. on that same day, the nursing staff entered notes stating that Plaintiff ate seventy-five percent of his meal, and that staff reminded Plaintiff that they needed a urine sample.  (Hatfield Dep. at 48-49; Hatfield Aff. Attach. 1 at 13.)   The nursing notes indicate that Plaintiff complained that his vision was shaky, that his ear hurt, and that he was not faking.  (Hatfield Aff. Attach. 1 at 13.)

At 1:00 p.m. on that same day, Nurse Practitioner Hatfield entered an Order directing that Plaintiff receive Tylenol 650 mg every four to six hours for his headache and pain.  (Hatfield Dep. at 50; Hatfield Aff. Attach. 1 at 15.)

14

At 5:00 p.m. on that same day, Nurse Dodd examined Plaintiff, noting that Plaintiff was resting quietly on his mat and that he was easily awakened.  (DSMF ¶ 40; PRDSMF ¶ 40.)  Plaintiff complained that his ear and head hurt, and that he was dizzy.  (DSMF ¶ 41; PRDSMF ¶ 41.)  Nurse Dodd noted that Plaintiff had eaten 100 percent of his supper meal, that he was alert and oriented, and that he had his eyes wide open, but was shielding his eyes from the light.  (DSMF ¶ 42; PRDSMF ¶ 42.)  Nurse Dodd gave Plaintiff another dose of Tylenol 650 mg.  (Hatfield Dep. at 53; Hatfield Aff. Attach. 1 at 13.)

At 9:30 p.m. on that same day, Nurse Dodd obtained a urine sample from Plaintiff, and noted the results in Plaintiff's chart as being within normal limits.  (DSMF ¶ 44; PRDSMF ¶ 44.)

15

At 10:30 p.m., Nurse Lisa Hollis assessed and examined Plaintiff, noting that his vital signs all were within normal limits. (DSMF ¶ 45; PRDSMF ¶ 45.) Nurse Hollis' notes indicate that Plaintiff was sleeping with his head covered and voiced no complaints. (DSMF ¶ 45; PRDSMF ¶ 45.)

On July 10, 2006, Nurse Amy Freeman examined and assessed Plaintiff. (DSMF ¶ 46; PRDSMF ¶ 46.) Nurse Freeman's notes indicate that Plaintiff was holding his head in his hands, and that Plaintiff was resting on his mat. (Hatfield Aff. Attach. 1 at 13.) Nurse Freeman's notes state that Plaintiff did not exhibit signs of acute distress, but that Plaintiff complained of a headache. (Hatfield Dep. at 55-56; Hatfield Aff. Attach. 1 at 13.) Nurse Freeman gave Plaintiff 325 mg of Tylenol, and directed Plaintiff to let the nursing

16

staff know if his headache got worse.  (Hatfield Dep. at 55-56; Hatfield Aff. Attach. 1 at 13.)

At 8:30 a.m. on that same day, Nurse Practitioner Hatfield examined Plaintiff.  (DSMF ¶ 49; PRDSMF ¶ 49.) During that examination, Plaintiff complained of neck pain. (DSMF ¶ 49; PRDSMF ¶ 49.)  Nurse Practitioner Hatfield's examination of Plaintiff indicated that Plaintiff's right ear still had blood behind the ear drum, and that Plaintiff's gait was unsteady.  (Hatfield Dep. at 57-58; Hatfield Aff. Attach. 1 at 10.)  Nurse Practitioner Hatfield performed several neurological assessments of Plaintiff, finding that Plaintiff was alert and oriented as to person, place, and time, that Plaintiff had an intact finger to nose test, that Plaintiff's pupils were equal and reactive to light, that Plaintiff's cranial nerves II - XII were intact, and that Plaintiff's extra ocular

17

movements[2] were intact.  (DSMF ¶ 51; PRDSMF ¶ 51.)
Nurse Practitioner Hatfield checked Plaintiff's vital signs and
his heart and lungs, all of which were within normal limits.
(DSMF ¶ 53; PRDSMF ¶ 53.)

Nurse Practitioner Hatfield discontinued Tylenol and
directed that Plaintiff receive Ibuprofen 800 mg twice daily
for seven days.  (Hatfield Aff. ¶ 54 & Attach. 1 at 15;
Hatfield Dep. at 61, 63.)  Nurse Practitioner Hatfield also
ordered that Plaintiff receive blood work, including a CBC
and a CMP.  (Hatfield Aff. ¶ 54 & Attach. 1 at 15; Hatfield
Dep. at 63.)  Nurse Practitioner Hatfield placed Plaintiff on
the list of inmates to be seen by the medical doctor on the

---

[2]An extra ocular movement test is a check of all visual fields,
performed by moving an object to the side and up and down to see
whether the patient follows the object.  (DSMF ¶ 52; PRDSMF ¶
52.)

18

following day.  (Hatfield Dep. at 59, 61, 63; Hatfield Aff. ¶ 55 & Attach. 1 at 15.)

At 7:00 p.m. on that same day, Nurse Hollis assessed and examined Plaintiff.   (DSMF ¶ 56; PRDSMF ¶ 56.) Nurse Hollis noted that Plaintiff voiced no complaints, that he was resting on the bunk with his head covered, and that his vital signs all were within normal limits.  (DSMF ¶ 57; PRDSMF ¶ 57.)

On the morning of July 11, 2006, Nurse Potasha Glenn examined Plaintiff, noting that Plaintiff voiced no complaints, that his vital signs were within normal limits, that he appeared to be sleeping comfortably, and that his respirations were even and unlabored.   (DSMF ¶ 58; PRDSMF ¶ 58.)

19

At approximately noon on that same day, Dr. Smith examined Plaintiff. (Hatfield Dep. at 66; Hatfield Aff. Attach. 1 at 10.) Dr. Smith's notes indicate that he observed blood in Plaintiff's right ear, and that he assessed Plaintiff as being dizzy. (Hatfield Dep. at 67; Hatfield Aff. Attach. 1 at 10.)

At 12:15 p.m. on that same day, Dr. Smith and Nurse Practitioner Hatfield submitted an order to obtain the emergency room records and CT x-ray reports for Plaintiff from the night of his arrest from Floyd Medical Center. (DSMF ¶ 60; PRDSMF ¶ 60.)

At 7:00 on that same day, Nurse Hollis examined Plaintiff. (DSMF ¶ 61; PRDSMF ¶ 61.) Although Plaintiff refused to sit up, he voiced no complaints. (DSMF ¶ 62; PRDSMF ¶ 62.) Plaintiff's vital signs all were within normal

20

limits.  (DSMF ¶ 63; PRDSMF ¶ 63.)

On July 12, 2006, at 7:00 a.m., Nurse Freeman examined Plaintiff.  (Hatfield Dep. at 68-69; Hatfield Aff. Attach. 1 at 14.)  Nurse Freeman's notes indicate that Plaintiff was lying on the floor, that Plaintiff voiced no complaints, and that Plaintiff's vital signs were within normal limits.  (Hatfield Aff. Attach. 1 at 14.)  Nurse Freeman's notes also indicate that she urged Plaintiff to get up and move around, and that she told him to notify the nurses with his needs.  (Id.)

At 9:40 a.m. on that same day, Nurse Practitioner Hatfield checked Plaintiff, who complained of neck pain. (DSMF ¶ 65; PRDSMF ¶ 65.)  Nurse Practitioner Hatfield found that Plaintiff's pupils were equal and reactive to light, that he was oriented as to person, place, and time, that his

21

neck was supple and had full range of motion, and that his lungs were clear.  (DSMF ¶ 66; PRDSMF ¶ 66.)  Nurse Practitioner Hatfield also noted that Plaintiff's gait was unsteady, and ordered a muscle relaxer to assist in relieving Plaintiff's neck pain.  (DSMF ¶ 67; PRDSMF ¶ 67.)

At approximately 7:40 p.m. on that same day, Nurse Sharon Latimer examined Plaintiff.  (DSMF ¶ 68; PRDSMF ¶ 68.)   Nurse Latimer noted that Plaintiff denied any complaints, that he appeared to be sleeping but was easily aroused, that his vital signs were within normal limits, and that she observed no acute distress.    (DSMF ¶ 69; PRDSMF ¶ 69.)  Nurse Latimer noted that the medical staff would continue monitoring Plaintiff for improvement of his ruptured ear drum, complaints of dizziness and headache, and indications of acute distress.  (DSMF ¶ 70; PRDSMF ¶

22

70.)  Nurse Latimer advised Plaintiff to notify the medical staff of any needs or complaints, and Plaintiff voiced his understanding.  (DSMF ¶ 71; PRDSMF ¶ 71.)

At 7:30 a.m. on July 13, 2006, Nurse Glen woke Plaintiff.  (DSMF ¶ 72; PRDSMF ¶ 72.)  Nurse Glen observed that Plaintiff voiced no complaints, that his vital signs were within normal limits, and that he had no visible drainage from his ear.  (DSMF ¶ 72; PRDSMF ¶ 72.)

At 9:50 a.m. that same day, Dr. Ginn, a psychologist, examined Plaintiff.  (DSMF ¶ 73; PRDSMF ¶ 73.)  Dr. Ginn concluded that Plaintiff was no longer suicidal and did not present a mental health issue.  (DSMF ¶ 74; PRDSMF ¶ 74.)

At 2:10 p.m. on that same day, Nurse Practitioner Hatfield rechecked Plaintiff for his complaints of headache

23

and neck pain.  (DSMF ¶ 75; PRDSMF ¶ 75.)  Because Plaintiff's symptoms were not resolving and because she had not yet received the records from Floyd Medical Center, Nurse Practitioner Hatfield ordered a CT scan of Plaintiff's head.  (DSMF ¶ 76; PRDSMF ¶ 76.)

At approximately 2:30 p.m. on that same day, Jail staff transported Plaintiff to Coosa Diagnostics for the CT scan. (DSMF ¶ 77; PRDSMF ¶ 77.)  Following the CT scan, a radiologist at Coosa Diagnostics called Nurse Practitioner Hatfield to inform her that Plaintiff had air and a "bleed" in his head.  (DSMF ¶ 78; PRDSMF ¶ 78.)  Nurse Practitioner Hatfield then called Floyd Medical Center, and alerted an emergency room doctor that an inmate would be arriving there.  (DSMF ¶ 79; PRDSMF ¶ 79.)  Plaintiff then was transported to Floyd Medical Center for further medical

24

treatment.  (DSMF ¶ 80; PRDSMF ¶ 80.)

Plaintiff initially testified that he remembers only "bits and pieces" of events that occurred between July 4, 2006, and July 12, 2006, but later testified that he remembers "everything" that occurred after his transfer to general population. (Pl. Dep. at 83, 93, 96-100, 203.) According to Plaintiff, he remained in general population until July 12, 2006.  (Id. at 144-147, 213-14.)

### 3.    Policies and Procedures

Plaintiff retained Dr. Jimmy Graham as an expert witness.   Dr. Graham testified that he had reviewed Defendant's written policies and procedures, and that he saw no deficiencies in those policies and procedures. (Graham Dep. at 59.)  In Dr. Graham's opinion, most jails will attempt to bond out an inmate or release an inmate if

25

the inmate requires expensive tests and medical procedures, or will wait and hope the inmate's symptoms improve, because the jails do not want to incur the cost of treatment and tests. (Id. at 60-61.) Dr. Graham testified that his past experience relates to other jails, including the Fairburn jail. (Id. at 63.) Dr. Graham, however, testified that this case is the only one he has seen from the Jail. (Id.) Dr. Graham initially testified that he worked for Defendant as a contract provider in 2002 and 2003, at the Carroll County, Georgia, Jail but later clarified that he worked for a different entity with a similar name. (Id. at 68, 81-83.) Dr. Graham never actually worked for Defendant. (Id. at 81-82.)

**B.  Procedural Background**

On June 12, 2008, Plaintiff filed this lawsuit. (Docket

AO 72A

(Rev.8/82)

Entry No. 1.)   Plaintiff initially named Defendant, Floyd County, Georgia, Christopher Shelly, Joseph Henderson, Ronald Chafin, and several John Does as defendants. (Id.)

On February 9, 2010, the Court entered an Order granting the parties' Consent Motion for Dismissal With Prejudice as to Mr. Henderson, Mr. Shelly, and Mr. Chafin. (Order of Feb. 9, 2010.)   On March 19, 2010, the Court entered an Order granting the parties' Consent Motion to Dismiss Floyd County, Georgia, with prejudice.  (Order of Mar. 19, 2010.)

On May 14, 2010, Defendant filed its Motion for Summary Judgment, arguing that no genuine dispute remains with respect to any of Plaintiff's claims.  (Docket Entry No. 54.)  Plaintiff has responded to that Motion, and the time period in which Defendant could file a reply in

AO 72A

(Rev.8/82)

support of the Motion has expired.   The Court therefore finds that the Motion is ripe for resolution by the Court.

## II.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) authorizes summary judgment when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the Court that summary judgment is appropriate, and may satisfy this burden by pointing to materials in the record.  Reese v. Herbert, 527 F.3d 1253, 1269 (11th Cir. 2008) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); Allen v. Bd. of Public Educ. for Bibb County, 495 F.3d 1306, 1313 (11th Cir. 2007).  Once the moving party

28

has supported its motion adequately, the non-movant has the burden of showing summary judgment is improper by coming forward with specific facts that demonstrate the existence of a genuine issue for trial.  <u>Allen</u>, 495 F.3d at 1314.

When evaluating a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. <u>Optimum Techs., Inc.</u>, 496 F.3d at 1241.  The Court also must "'resolve all reasonable doubts about the facts in favor of the non-movant.'" <u>Rioux v. City of Atlanta, Ga.</u>, 520 F.3d 1269, 1274 (11th Cir. 2008) (quoting <u>United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.</u>, 894 F.2d 1555, 1558 (11th Cir. 1990)).  Further, the Court may not make credibility determinations, weigh conflicting evidence to

29

resolve disputed factual issues, or assess the quality of the evidence presented. <u>Reese</u>, 527 F.3d at 1271; <u>Skop v. City of Atlanta, Ga.</u>, 485 F.3d 1130, 1140 (11th Cir. 2007). Finally, the Court does not make factual determinations. <u>In re Celotex Corp.</u>, 487 F.3d at 1328.

## III.   Discussion

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's prohibition against unnecessary and wanton infliction of pain. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). To survive a motion for summary judgment, Plaintiff must demonstrate that a genuine dispute exists whether: (1) Plaintiff suffered from a serious medical need; (2) Defendant was deliberately indifferent to that need; and (3) Defendant's deliberate indifference caused harm to Plaintiff. <u>Taylor v. Adams</u>, 221

30

F.3d 1254, 1258 (11th Cir. 2000).

"[A]n official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (quoting Lancaster v. Monroe County, 116 F.3d 1419, 1425 (11th Cir. 1997)).   Allegations that an official refused to provide treatment other than medicine that was plainly inadequate or inappropriate under the circumstances may state a claim of deliberate indifference.  Id. at 1257. Additionally, "'[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.'" Id. at 1255 (quoting Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989)) (alteration in original).

31

Moreover, a delay in access to medical care that is "tantamount to 'unnecessary and wanton infliction of pain'" may constitute deliberate indifference.  <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (quoting <u>Estelle</u>, 429 U.S. at 104).  "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay.  A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference."  <u>Harris v. Coweta County</u>, 21 F.3d 388, 393-94 (11th Cir. 1994).  When determining whether a delay in providing medical treatment rises to the level of a constitutional violation, a court must consider "the context of the seriousness of the medical need," "whether the delay worsened the medical condition," and "the reason for the

32

delay." <u>Ciccone v. Sapp</u>, No. 06-14944, 2007 WL 1841079, at *4 (11th Cir. June 28, 2007) (per curiam) (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1189 (11th Cir. 1994)), <u>abrogated on other grounds by</u> Hope v. Pelzer, 536 U.S. 730 (2002)), <u>cert. denied</u>, 128 S. Ct. 898 (2008). Finally, "'[a]n inmate who complains that [a] delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of [the] delay in medical treatment to succeed.'" <u>Surber v. Dixie County Jail</u>, 206 F. App'x 931, 933 (11th Cir. 2006) (per curiam) (quoting <u>Hill</u>, 40 F.3d at 1188).

Here, Defendant contends that it was not deliberately indifferent to Plaintiff's serious medical needs, because no member of its medical staff knew of a substantial risk of

AO 72A
(Rev.8/82)

serious harm and intentionally refused Plaintiff adequate medical treatment.  According to Defendant, based on the fact that Floyd Medical Center gave Plaintiff a written medical clearance, and based on Nurse Practitioner Hatfield's knowledge of Plaintiff's prior medical history of migraine headaches, it was reasonable for Defendant's medical personnel, including Nurse Practitioner Hatfield, to treat Plaintiff for headaches.   Defendant notes that, beginning June 10, 2006, Nurse Practitioner Hatfield immediately began requesting additional laboratory work and referred Plaintiff to the physician for further evaluation.

The Court, however, concludes that, viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in Plaintiff's favor, a genuine dispute remains as to whether Defendant's medical staff were deliberately

34

indifferent to Plaintiff's serious medical need.   Plaintiff testified that, after his transfer to the Jail's general population area, he remained lying on the floor of his cell, unable to move, hold his head up, or eat.  The evidence in the record indicates that Nurse Dodd was summoned to Plaintiff's cell block to evaluate Plaintiff, and that she was informed that Plaintiff could not get up, that he had not eaten for five days, that he had only urinated one time during that time period, that his head hurt so badly that he could not move, that he could not hear very well out of his right ear, and that his neck also hurt.  (Hatfield Aff. Attach. 1 at 12.)  Although Defendant's personnel gave Plaintiff Tylenol and Ibuprofen for his headaches, monitored him, conducted a urinalysis, and ordered blood tests, Plaintiff's symptoms failed to improve for a period of nearly four days.

AO 72A

(Rev.8/82)

Defendant's personnel failed to take additional steps to discover the real cause of Plaintiff's trauma.  Given that delay, the Court finds that a genuine dispute exists as to whether the treatment provided to Plaintiff was simply so cursory as to amount to no treatment at all for his condition. The Court therefore cannot grant Defendant's Motion for Summary Judgment based on Defendant's argument that its personnel were not deliberately indifferent to Plaintiff's serious medical need.[3]

This conclusion, however, does not end the Court's inquiry.  For purposes of § 1983 liability, Defendant, as a private entity that contracts with a county to provide medical services to inmates, is considered the functional equivalent

_____

[3]Qualified immunity is not an issue in this case because Defendant is not entitled to assert qualified immunity as a defense. Swann v. Southern Health Partners, Inc., 388 F.3d 834, 836-37 (11th Cir. 2004).

36

of a municipality.  <u>Buckner v. Toro</u>, 116 F.3d 450, 452-53 (11th Cir. 1997) (per curiam).  A plaintiff seeking to hold a municipality liable under § 1983 must identify a policy or custom of the municipality that caused the plaintiff's injury. <u>Id.</u>; <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 385 (1989).  "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality."  <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997).  A custom may exist for purposes of municipality under § 1983 if a practice is so settled, widespread, and permanent that the custom has the force of law.  <u>Board of County Comm'rs of Bryan County, Okla. v. Brown</u>, 520 U.S. 397, 404 (1997); <u>McDowell v. Brown</u>, 392 F.3d, 1283, 1290 (11th Cir. 2004).  To demonstrate that a

37

policy or custom exists, the plaintiff generally must "show a persistent and widespread practice." McDowell, 392 F.3d at 1290. "[A] municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy 'if the municipality tacitly authorizes these actions or displays deliberate indifference towards the misconduct.'" Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001) (quoting Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987)).

Here, Plaintiff contends that Defendant had a practice of relying solely on hospital clearance and of not ordering an inmate's emergency room records, that Defendant had a practice of using the least costly means to treat inmates, that Defendant had a practice of not referring inmates to medical doctors; and that Defendant had a practice of only

AO 72A
(Rev.8/82)

providing medical care if an inmate personally complained about his or her condition.  For the following reasons, the Court concludes that those assertions are insufficient to establish § 1983 liability against Defendant.

First, Plaintiff complains that Defendant had a practice of relying on hospital clearance, rather than performing its own medical clearance of inmates, and that Defendant had a practice of not requesting hospital records for inmates.  At most, however, Plaintiff's evidence only points to one incident--the instant case--involving an allegedly unconstitutional deprivation.  Evidence of this single incident, however, simply is not sufficient to establish a custom, policy, or practice under § 1983.  Grech v. Clayton County, Ga., 335 F.3d 1326, 1330 (11th Cir. 2003).

Second, Plaintiff bases his assertion that Defendant

39

had a practice of using the least costly means available to treat an inmate on Dr. Graham's testimony. (See Pl.'s Statement Additional Material Fact ("PSAMF") ¶ 18 (citing Graham Dep. at 8, 60, 61).) Dr. Graham, however, testified that his opinion was based on his experience providing medical care at other jails, and that this lawsuit was the first incident involving the Jail of which he had knowledge. Dr. Graham further testified that he had never been employed by Defendant. Under those circumstances, Dr. Graham lacks personal knowledge of the practices and procedures in effect at the Jail, and his testimony is not sufficient to create a genuine dispute as to whether Defendant had a policy or practice of using the least costly means to treat inmates.

Third, Plaintiff bases his contention that Defendant had

AO 72A

(Rev. 8/82)

a practice of not referring inmates to doctors on Dr. Graham's testimony concerning his own experience. (PSAMF ¶ 20.)   As previously discussed, however, Dr. Graham admitted that his experience did not relate to the Jail, that he did not work for Defendant and never previously worked for Defendant, and that his knowledge concerning the Jail came from this lawsuit.   Under those circumstances, Dr. Graham lacks personal knowledge of policies and practices of Defendant or the Jail, and his testimony cannot create a genuine dispute as to whether Defendant had a policy or practice of failing to refer inmates to medical doctors.

Finally, Plaintiff contends that Defendant had a practice of providing medical care only to inmates who personally complained about their medical conditions.   (PSAMF ¶ 22

41

(citing Hatfield Dep. at 37, 54, 65-66, 68-69, 76.)   The testimony that Plaintiff cites, however, fails to support this contention.   Plaintiff consequently cannot establish that Defendant had an unconstitutional policy or practice based on this argument.

In sum, the Court concludes that, although a genuine dispute remains as to whether Defendant was deliberately indifferent to Plaintiff's serious medical need, Plaintiff has failed to establish a genuine issue of material fact as to whether Defendant had an unconstitutional policy, practice, or custom that caused Plaintiff's injury.   Under those circumstances, the Court simply cannot hold Defendant liable under § 1983.   The Court therefore grants Defendant's Motion for Summary Judgment.

42

AO 72A
(Rev.8/82)

## IV.  Conclusion

ACCORDINGLY, the Court **GRANTS** Defendant Georgia Correctional Health, LLC's Motion for Summary Judgment [54].   The Court **DISMISSES** the John Doe Defendants from this action, based on Plaintiff's failure to identify and serve those Defendants with process during the discovery period.   The Court **DISMISSES** this case, and **DIRECTS** the Clerk to **CLOSE** this action.

IT IS SO ORDERED, this the 23 day of June, 2010.

_____
UNITED STATES DISTRICT JUDGE

43

AO 72A

(Rev.8/82)